**UNITED STATES of America and the State of Illinois, EX REL. Kelly BALTAZAR, Plaintiffs,**

v.

**Lillian S. WARDEN, an individual, and Advanced Healthcare Associates, an Illinois corporation, Defendants.**

**Case No. 07 C 4107**

United States District Court, N.D. Illinois, Eastern Division.

Signed September 8, 2014

Matthew Ignatius Farmer, Robin B. Potter, Denise M. Quimby, Shankar Ramamurthy, Robin Potter & Associates, P.C., Edward George Renner, Law Offices of Edward G. Renner, Chicago, IL, for Plaintiffs.

Michael T. Hannafan, Blake T. Hannafan, Stacey Blaire Vucko, Hannafan & Hannafan, Chicago, IL, for Defendants.

### ORDER

Daniel G. Martin, United States Magistrate Judge.

For the reasons and to the extent stated below, Plaintiff's Amended Motion for Protective Order and Relief to Remedy Defense Counsel's Deposition Misconduct [140] is granted in part. In all other respects, Plaintiff's protective order motion is denied. Plaintiff's Motion for Leave to Submit Supplemental Authority in Support of Amended Motion for Protective Order [155] and Second Motion for Leave to Submit Supplemental Authority in Support of Amended Motion for Protective Order [171] are granted. Discovery, including the continued deposition of Plaintiff, remains stayed pending further order of the Court. Plaintiff's affidavit of expenses and fees incurred in bringing the motion is due by 9/15/2014. Defendants may respond by 9/22/2014.

### STATEMENT

Plaintiff Kelly Baltazar ("Baltazar") charges defense counsel Michael Hannafan ("Attorney Hannafan") with inappropriate and unprofessional conduct at Baltazar's deposition. Specifically, Baltazar accuses Attorney Hannafan of the following misconduct: (1) preventing Baltazar from testifying; (2) misrepresenting the record; (3) using a settlement letter in violation of Federal Rule of Evidence 408; (4) abusive, repetitive, and irrelevant questioning and conduct towards Baltazar and her counsel; (5) invading privilege; (6) wasting time; and (7) prematurely terminating the deposition. Baltazar seeks entry of a protective order and other relief under Rules 26(c)(1), 30(d)(3), and 37 of the Federal Rules of Civil Procedure as well as the Civility Rules of the 7th Circuit and Rules of Professional Conduct and 28 U.S.C. § 1927 for Attorney Hannafan's conduct during her deposition. Baltazar requests that this Court order that: (1) her deposition to be continued in the Court's attorney-witness room; (2) her deposition be stricken; (3) her deposition be reconvened, subject to questioning only by her counsel and barring Attorney Hannafan and counsel for Defendants from questioning; (4) to the extent Attorney Hannafan or Defendants' counsel be allowed to participate in the re-convened deposition, limit their time to one hour and bar any conduct which includes raising their voices, arguing with or interrupting the witness, making sarcastic, abusive or harassing comments, repeating any questions already asked, sneering, ridiculing or any similar misconduct; (5) defense counsel is not permitted to characterize Baltazar in any way, including to state she is a liar; (6) defense counsel is not permitted to purposefully misrepresent the record or violate Federal Rule of Evidence 106 and the rule of completeness; (7) defense counsel is not permitted to purposefully waste time; and (8) awarding Baltazar her attorneys' fees and costs in defending the deposition and bringing the instant motion.

Defendants respond that Attorney Hannafan did nothing improper and his conduct does not warrant sanctions. Defendants say Baltazar's motion "borders on hysteria and shows that her counsel is addicted to overstatement." (Doc. 142 at 1). Defendants contend that their deposition of Baltazar was an investigation into relevant topics. Defendants point out that Baltazar's counsel could have sought to terminate or limit her deposition as abusive pursuant to Federal Rule of Civil Procedure 30(d)(3)(A), but they did not do so.

"In general, counsel should not engage in any conduct during a deposition that would not be allowed in the presence of a judicial officer." Advisory Committee Notes to 1993

Amendments to Rule 30(d)(3). Federal Rule of Civil Procedure 26(c)(1) provides that courts may issue a protective order to protect a party from annoyance, embarrassment, or oppression for good cause. Potential limits include specifying the terms of discovery, forbidding inquiry into certain matters, limiting the scope of discovery, and designating the persons who may be present while discovery is conducted. Rule 30(d)(3) provides that at any time during a deposition, a party may move to terminate or limit it "on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party." Fed. R. Civ. P. 30(d)(3)(A). "The court may order that the deposition be terminated or may limit its scope and manner as provided in Rule 26(c)." Fed. R. Civ. P. 30(d)(3)(B). Rule 30(d)(2) permits an "appropriate sanction—including reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2).

■ Pursuant to 28 U.S.C. § 1927, "[an] attorney ... who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. "Sanctions may only be awarded under 28 U.S.C. § 1927 against an individual who has demonstrated 'subjective or objective bad faith.'" *Moriarty ex rel. Local No. 727 v. Svec*, 429 F.3d 710, 722 (7th Cir.2005) (*quoting Pac. Dunlop Holdings, Inc. v. Barosh*, 22 F.3d 113, 120 (7th Cir.1994) ).[1] Finally, "[d]istrict courts have broad discretion in supervising discovery, including deciding whether and how to sanction ... misconduct." *Hunt v. DaVita, Inc.*, 680 F.3d 775, 780 (7th Cir. 2012). The Court has carefully reviewed the deposition transcript and the video recording of the deposition in full and addresses each type of alleged misconduct below.

1. Baltazar also relies on Standard 20 of the Seventh Circuit Standards for Professional Conduct, which states that counsel "will not engage in any conduct during a deposition that would not be appropriate in the presence of a judge." *See* https://www.ca7.uscourts.gov/Rules/rules.

### A. Interrupting Baltazar

■ Baltazar first asserts that Attorney Hannafan repeatedly interrupted her before she had completed her answer to a question. The Court has reviewed the examples submitted by Baltazar and has found interruptions by Attorney Hannafan. The record does reveal that Attorney Hannafan tried to prevent Baltazar from explaining her answers. The Court does not condone the practice of interrupting a witness before she has completed an answer but does not conclude that the examples cited satisfy the relevant standards for imposing sanctions. The interruptions did not prevent a fair examination of Dr. Baltazar. The interruptions also did not unnecessarily prolong the proceedings or demonstrate bad faith sanctionable under 28 U.S.C. § 1927. The Court denies the request for sanctions as it pertains to the interruptions.

### B. Misrepresenting the Record

The second instance of alleged misconduct involves Attorney Hannafan's misrepresentation of the record. Baltazar asserts that defense counsel "repeatedly misrepresented the record for the purpose of confusing the witness and securing a 'gotcha' admission that Baltazar or her lawyers lied when they did not." (Doc. 140 at 4).

■ The first example provided by Baltazar of such a circumstance deals with Paragraph 36 of the First Amended Complaint ("FAC"). In paragraph 36 of the FAC, Baltazar states that in approximately mid-March 2007, she "corrected the billing slips that were revised by Dr. Warden, to insure that the clients and carriers would be appropriately charged and not overbilled." (Doc. 17 at 8–9). At the deposition, Attorney Hannafan asked Baltazar: "[S]o at the time this complaint was filed in August of '08, you knew that that statement, where it states that you corrected the billing slips that were

htm# standards. Those Standards "are designed to encourage ... judges and lawyers, to meet our obligations to each other, to litigants and to the system of justice" but "shall not be used as a basis for ... sanctions or penalties."

revised by Dr. Warden, was false, didn't you?" (Dep. at 14:2–6). Baltazar answered: "I knew that that statement was false." (Dep. at 14:17). Baltazar then clarified: "I believe I had informed my attorney of the falsity of that. I was unaware of what happened after that time." (Dep. at 15:13–15). Baltazar's counsel notified Defendants on November 10, 2008 in a response to a motion to dismiss that "Plaintiff did not correct the fraudulent March 2007 billings after discovering them." (Doc. 29 at 6 n. 1). In her answer to Defendants' Interrogatory No. 17, Baltazar further notified Defendants that "Plaintiff did not make any changes to fee slips in March 2007 as described in Paragraph 36 of the First Amended Complaint. This Response serves as Notice to Defendants that this portion of the allegation in Paragraph 36 of the First Amended Complaint is in error in the above respect." (Doc. 137–1 at 8).

Baltazar argues that Attorney Hannafan's failure to show her these documents retracting the error violated the rules of professional conduct and the rule of completeness under Federal Rule of Evidence 106. Attorney Hannafan's questions as to paragraph 36 of the FAC were not inappropriate. Baltazar's counsel may ask her questions at the end of her deposition to clarify the testimony on this issue. The relevance and admissibility of Baltazar's testimony in response to defense counsel's questions will be decided at a later date. If admissible and Defendants seek to introduce Baltazar's deposition testimony at trial, under the doctrine of completeness, Baltazar will be permitted to read other parts of her deposition that are necessary to give a complete recitation of the facts at issue and the meaning of the statements made by Baltazar. *See* Fed. R. Civ. P. 32(a)(4) (stating "[i]f only part of a deposition is offered in evidence by a party, an adverse party may require the offeror to introduce any other part which ought in fairness be considered with the part introduced, and any party may introduce any other parts.").

■ The next instance of alleged misconduct cited by Baltazar concerns Attorney Hannafan's questions regarding paragraph 28 of her FAC. In paragraph 28 of the FAC, Baltazar alleges that "[Defendant] Advance [Healthcare Associates] is a financially profitable enterprise." (Doc. 17 at 6, ¶ 28). Baltazar asserts that Attorney "Hannafan berated and bullied Baltazar to concede it was a 'lie' that defendants were profitable simply because she had not read the financials." (Doc. 140 at 5). The following example from the transcript exemplifies the conduct:

Q. Would you turn to page 6 of Plaintiff's Exhibit1, paragraph 28. It says that, "Advanced is a financially profitable enterprise." Do you see that?

A. Yes.

Q. How do you know that?

A. Based on the information provided in articles, based on information that was discussed at our weekly meetings.

Q. Pardon me?

A. Information that was discussed at our weekly staff meetings. And in addition to information that had been published.

Q. Well, did you ever see any of the financial statements or profit—

A. No.

Q. —and loss statements?

A. No.

Q. It's possible, isn't it, that the business was losing its shirt even though it was taking in revenue?

A. It's possible.
    * * *

Q. So you didn't know whether it was a financially profitable enterprise or not, did you?

Mr. Farmer: Objection, foundation, time frame.

A. I can't recall at the time.

Q. So this is another potential lie in here that Advanced is a financially profitable enterprise because you didn't know, did you?

Mr. Farmer: Same objection.

Q. You didn't know that it was a financially profitable enterprise, did you? Yes or no?

A. No.

Q. Another lie, right?

A. Yes.

(Dep. at 162:17–164:17).

The Court finds that it was inappropriate for Attorney Hannafan to press Baltazar into testifying that she had lied about Defendant Advance's profitability for two reasons. First, Baltazar's admission that she did not personally see Advanced's financial statements does not compel the conclusion that she lied when she alleged that Advanced is financially profitable. As Baltazar explained, her allegation regarding Advance's profitability was appropriately based on information that was discussed at staff meetings and information she read in articles. Second, Baltazar did not lie. To tell a lie is to "make an untrue statement with intent to deceive" or "to create a false or misleading impression." Merriam–Webster's Collegiate Dictionary 717 (11th ed. 2003). Baltazar's allegation regarding Advance's profitability is true, as Defendants admitted in their Answer that "Advance has made a profit." (Doc. 64 at 10, ¶ 28). The clear purpose of Attorney Hannafan's questioning on this issue was to accuse Baltazar of lying. Given Defendants' admission, this behavior was improper.

## C. Violating Federal Rule of Evidence 408

█ Baltazar next contends that Attorney Hannafan violated Federal Rule of Evidence 408 and misused her settlement letter by entering into evidence her settlement demand of February 21, 2014 over her counsel's objection. (Dep. at 240:11–241:12). The Court disagrees. Rule 408 governs the admissibility of evidence at trial and does not necessarily protect such evidence from discovery. *White v. Kenneth Warren & Son, Ltd.*, 203 F.R.D. 364, 368 (N.D.Ill.2001); *McNally Tunneling Corp. v. City of Evanston, Illinois*, 2001 WL 1246630, at *1 (N.D.Ill. Oct. 18, 2001). For this reason, the Court finds nothing improper about Attorney Hannafan's limited use of Baltazar's settlement demand letter at her deposition. The settlement demand's admissibility at trial is a different matter.

## D. Invading Privilege

Baltazar asserts that defense counsel solicited her to repeatedly discuss privileged communications despite her counsel's objection. Having reviewed the two specific instances cited by Baltazar and having watched the video of the entirety of defense counsel's conduct at the deposition, the questioning in this regard did not rise the level of misconduct that would warrant sanctions. Baltazar's counsel had the opportunity to object to such questioning and repeatedly and successfully invoked the attorney-client privilege with instructions not to answer. (Dep. at 96, 105, 108, 110, 126, 167, 210, 228, 245, 234, 272).

## E. Abusive, Repetitive, and Irrelevant Questioning

Baltazar contends that Attorney Hannafan engaged in abusive, repetitive, and irrelevant questioning which wasted time. The transcript and videotape of the deposition confirm Baltazar's characterization. The record reflects that the tone of the deposition was hostile and confrontational from the beginning. Attorney Hannafan's second question amounted to a personal attack on Baltazar by calling her a liar. (Dep. at 5:11) ("You are a liar, aren't you). Attorney Hannafan was entitled to explore Baltazar's truthfulness but should not have resorted to personally attacking the deponent.

A review of Baltazar's citations reveals numerous instances of inappropriate, insulting, and offensive remarks and questions by Attorney Hannafan to Baltazar. For example, Baltazar testified that on June 7, 2007, she discovered billing slips that contained services she did not perform. In response to Attorney Hannafan's questions, Baltazar further testified that she did not ask her colleagues if they performed the additional healthcare services on the billing slips because it was not standard practice. Attorney Hannafan then proceeded to insult Baltazar:

Q: I understand. That wasn't my question. My question was, when you found that there was information contained on the billing slips that didn't belong here, did you ask other practitioners whether they had performed some additional healthcare

services for that patient that you weren't aware of? Did you ask them?

A: I did not ask other practitioners.

Q: Pardon me?

A: I did not ask other practitioners.

Q: Well, why not? Why not?

A: Because that wasn't standard practice. It wasn't standard of how a fee slip was filled out.

Q: *Isn't that common sense? Did you have any common sense?*

MR. FARMER: Objection; argumentative.

By Mr. Hannafan:

Q: *Did you have any common sense at that time to just ask somebody else, hey, did you do this because I didn't.*

A: Each—

Q: Did you do that?

A: Most of the—

Q: Did you do that?

A: I did not ask other practitioners.

(Dep. at 51:6–52:7) (emphasis added). Attorney Hannafan asked Baltazar other disrespectful, sarcastic questions. *See* (Dep. at 25:18–22) ("Why in the world didn't you do that—in March of 2007? It's inconceivable.") (Dep. at 42:9) ("Are you kidding me?"); (Dep. at 101:19) ("Were they circus clowns?); (Dep. at 148:19) ("You understand English, right?); (Dep. at 156:2–4) ("Didn't you follow her around like a puppy dog during the first couple weeks of your employment?"); (Dep. at 240:8–10) ("Can you believe this? Okay. I'm sick of the complaint right now. I will go to something else."); (Dep. at 241:15) ("You are kidding me?);(Dep. at 242:12–13) ("Thank you. It's unbelievable. Well, anyway."); (Dep. at 257:11–13) ("Well, you had a number of conversations with her over the period of four lousy months that you worked there, isn't that right."). Such conduct is obviously not appropriate.

Another complaint about Attorney Hannafan's deposition conduct concerns his repeated questions regarding the effects of the lawsuit on Defendants, their personal finances and happiness, and the validity of the settlement demand:

Q: Do you know that your lawsuit has ruined the lives of Dr. Warden and her family?

MR. FARMER: Objection; lack of foundation.

By Mr. Hannafan:

Q: Do you know that?

A: I do not know how it has affected her or her family.

Q: Do you think it's been a pleasant experience for them?

MR. FARMER: Objection; calls for speculation; lack of foundation.

THE WITNESS: I don't know how it has affected their family.

By Mr. Hannafan:

Q: Do you think that have been happy—

MR. FARMER: Same—

By Mr. Hannafan:

Q: by having to defend this lawsuit in which you lied in an amended complaint in federal court?

MR. FARMER: Same objections.

THE WITNESS: I do not know how it has affect them.

(Dep. at 19:4–20:3).

\* \* \*

Q: At the time you filed the complaint, what did you think it was worth?

MR. FARMER: Let me get my objection. Objection; calls for speculation, lack of foundation.

By Mr. Hannafan:

Q: Answer the question.

A: I don't know an amount that it could have been.

Q: But several?

A: In the millions.

Q: Yes. Okay. Did you think that Dr. Warden and her family and her clinic were good for that kind of money?

MR. FARMER: Objection; calls for speculation.

By Mr. Hannafan:

Q: Did you?

A: I don't know that, how much money they have or that the office is producing.

Q: Have you since learned that they don't have any money?

(Dep. at 125:4–126:1)

\* \* \*

Q: Do you have knowledge from anybody other than your attorneys that Dr. Warden and her family do not have sufficient funds to pay even—to pay even a judgment of $50,000? Do you know that?

A: I don't know that from anyone other than—

Q: If that was true, do you insist on proceeding with this lawsuit to try to squeeze blood out of a turnip?

MR. FARMER: Objection; argumentative, calls for speculation.

Mr. Hannafan:

Q: Do you still persist on proceeding with this lawsuit?

A: I would like to proceed forward with this lawsuit.

Q: You would like to proceed forward with this lawsuit in which you are seeking millions of dollars from a family, Dr. Warden and her husband and four children, when they could not pay even a $50,000 judgment, is that what you are telling me?

MR. FARMER: Objection, assumes facts—

By Mr. Hannafan:

Q: Is that right?

A: I want to proceed forward with the lawsuit.

(Dep. at 126:9–127:17).

\* \* \*

Q: Did you know that Dr. Warden and her clinic do not have any liability insurance which covers this case?

A: I do not know that.

Q: You know it now though, don't you?

A: After you just said that, yes.

Q: And they don't. If they did, I wouldn't be sitting here. An insurance company lawyers would be sitting here. Do you care if you bankrupt Dr. Warden and her family and husband and family of four children? Do you care if you bankrupt them through this lawsuit?

MR. FARMER: Objection. Objection; argumentative.

THE WITNESS: I am uncertain of what the repercussions will be as a result.

By Mr. Hannafan:

Q: I say, do you care if they are forced into bankruptcy?

A: I would be—

Q: Yes or no? That's all I'm asking. It's simple. Yes or no? Do you care if they are forced into bankruptcy?

A: Yes.

Q: Why do you care?

A: Because I think being in that situation is unfortunate for anyone.

Q: It would be unfortunate for you too because you wouldn't get any money, isn't that true?

A: I don't know the specifics of that.

(Dep. at 129:10–130:17).

\* \* \*

Q: Did you meet her family? Did you meet the kids?

A: I met them. I don't recall if I met all of them. I don't recall their names.

Q: You don't care if they are suffering in this case either, do you?

MR. FARMER: Objection; argumentative.

By Mr. Hannafan:

Q: Do you? Do you?

A: I don't know the repercussion it would have on them.

Q: Do you think these are good repercussions that this suit is having on them?

MR. FARMER: Objection; calls for speculation.

By Mr. Hannafan:

Q: Huh? Do you think they are good repercussions? Happy, do you think that?

A: I don't know.

(Dep. at 133:14–134:8).

* * *

Q: Quote, "Thus, should Defendants lose at trial, the judgment against them will likely be for an amount between $39 million and $159 million, in addition to attorneys' fees." Do you see that reference?

A: Yes.

Q: Did you think—do you think that Dr. Warden and her family have that kind of money?

MR. FARMER: Objection; call for speculation.

THE WITNESS: I don't know what their finances currently are.

(Dep. at 244:5–17).

* * *

Q: When you filed—when you had asked your lawyers to file this case, did you think that Dr. Warden and her family had somewhere between $39 and $159 million to pay you and the government?

A: No.

Q: It's an absurd amount, isn't it?

MR. FARMER: Objection; form.

THE WITNESS: It's a lot of money.

(Dep. at 245:18–246:2). This line of questioning was utterly distasteful and completely disrespectful. It also appears of no relevance to the issues at hand. The Court is at a loss to understand how these questions sought relevant information or information reasonably calculated to lead to the discovery of admissible evidence in this litigation. These repetitive, irrelevant questions about the impact of the lawsuit on Defendant Warden and her family's happiness and her ability to satisfy a judgment seemed solely designed to unreasonably annoy, harass, and embarrass Baltazar.

Attorney Hannafan also displayed aggressive and threatening behavior toward opposing counsel and Baltazar on a number of occasions. At one point, Attorney Hannafan attempted to intimidate Baltazar by stating, "You are going to have to answer my question sooner or later. You can either answer it now or we can sit here and argue about it."

(Dep. at 24:6–8). When Baltazar's counsel objected that a question was argumentative, Attorney Hannafan responded:

MR. HANNAFAN: I will tell you what. I'm going to make a deal with you. You don't waive any objections—and you are not entitled to make these objections anyway during this deposition, as you well know, but I will make a deal with you. I will agree that you don't waive any objection to anything by not making them. Then we can kind of move along without your making objection that are not permitted in this deposition. Okay. Is that a deal?

MR. FARMER: Mike, all my objections—

MR. HANNAFAN: Is that a deal, yes or no?

MR. FARMER: No, I am not here to make deals.

MR. HANNAFAN: Okay. Fine. *We will do it the hard way.*

(Dep. at 25:24–26:15) (emphasis added). Attorney Hannafan later threatened Baltazar's counsel with Rule 11 sanctions. (Dep. at 50:3–5) (stating "You better think about Rule 11 here, Mr. Farmer, and you better think hard about Rule 11 sanctions. We will get to that later. Not today."). When Attorney Hannafan later asked Baltazar if she quit her job, Baltazar responded that she "ended [her] employment there." Attorney Hannafan threatened Baltazar by saying that a "jury is going to like that—a jury is really going to like that distinction. This case is going to a jury trial—. . . I just want to make sure that you understand whatever you say to me today, a jury is going to hear the same thing again. Do you understand that?" (Dep. at 146:6–15). When Baltazar would not admit that she "quit" her employment with Defendant Advanced Healthcare Associates, Attorney Hannafan repeatedly accused her of "quibbling" with him. (Dep. at 145:16–17) ("Why do you want to quibble with me?"); (Dep. at 145:24) ("Why do you want to quibble with me?"); (Dep. at 149:11) ("—don't quibble with me?"). Attorney Hannafan then declared: "You quit, so let's just get that straight. You can say whatever you want, but you quit." (Dep. at 150:17–19).

This conduct, threatening the witness and opposing counsel and arguing with the witness and commenting on her answers, is inappropriate and unprofessional.

Another example of Attorney Hannafan's intimidating and harassing conduct is evidenced by his repeated questions accusing Baltazar of violating the Health Insurance Portability and Accountability Act ("HIPAA") by disclosing patient records to the U.S. Attorney's Office and her attorneys. Baltazar contends that her conduct was protected under HIPAA's whistleblower exception, 45 C.F.R. § 164.502(j)(1).[2] Regardless of whether Baltazar's transfer of patient information is entitled to the protection of the HIPAA whistleblower provisions, Attorney Hannafan improperly harassed Baltazar by repeatedly accusing her of engaging in illegal behavior:

Q. Okay. Was this when you were crying and carrying on and illegally copying HIPAA protected documents?

MR. FARMER: Objection; argumentative, compound.

By Mr. Hannafan:

Q. Is that right? Is that when she came back in the afternoon?

A. She came back in the afternoon.

Q. While you were copying HIPAA protected documents and taking them?

A. I had copied the forms, the fee slips, and the SOAP notes in the morning.

Q. And you took them?

A. I did take them.

Q. You knew that was a violation of the HIPAA regulations and the HIPAA law, didn't you?

A. I did not know that that was—I know that there are some protections in the HIPAA law.

(Dep. at 34:1–19).

\* \* \*

Q. Well, you knew it was a violation of the HIPAA law for you to go in on June 8th and copy patient, private patient records and take them with you, didn't you?

A. I did not know—

Q. Didn't you? Yes or no?

A. —for sure.

Q. Not for sure?

A. I did not know.

(Dep. at 35:3–11).

\* \* \*

Q. That's when you illegally copied the records and took them from the office, isn't it?

A. That's when I took records from the office, yes.

Q. Excuse me?

A. I took records from the office that day, yes.

Q. But you know it's illegal to do that?

A. I do not know that that was illegal.

Q. You knew, you knew about the HIPAA confidentiality provisions, didn't you?

(Dep. at 60:23–61:11).

\* \* \*

Q. Did you call any of the patients whose records you copied before you copied them and asked for their approval to copy them and take them outside the office and use them for other purposes?

A. No.

Q. Did you ever tell these patients, whose records you copied and took them outside of the office, that you did that?

A. No.

**2.** Pursuant to 45 C.F.R. § 164.502(j)(1), "a covered entity is not considered to have violated the requirements of this subpart if a member of its workforce ... discloses protected health information" in the good faith belief that the covered entity "has engaged in conduct that is unlawful" and the disclosure is made to a "health oversight agency or public health authority authorized by law to investigate or otherwise oversee the relevant conduct" or "to an attorney retained by ... the workforce member ... for purposes of determining the legal options ... with regard to the conduct."

Q. Would you expect them to be unhappy about that?

(Dep. at 140:23–141:10).

\* \* \*

Q. So you consider Dr. Warden calling you after you left your employment and asking for records that you stole from her practice, private patient records, protected by HIPAA, and asked you to return them, and that's what you consider retaliation, is that right?

(Dep. at 151:6–11).

\* \* \*

Q. Do you agree that it was a federal offense; that is, a violation of HIPAA to copy confidential patient documents, take them out of the office, keep them and not return them?

A. I don't believe I agreed or disagreed at that time.

(Dep. at 231:1–6).

\* \* \*

Q. What do you think gave you the right to copy private and confidential HIPAA protected patient records and take them out of the office and give them to other people?

A. I gave them to my attorney.

Q. What did you think gave you the right to violate HIPAA?

A. I didn't know at the time if I was violating HIPAA regarding the circumstances of what I had observed and witnessed. And I did it for my own personal protection.

(Dep. at 235:11–21).

\* \* \*

Q. You were paid in full for your time at Advanced Healthcare Associates, correct—

A. Yes.

Q. —even after they found out that you had stolen records, right?

A. That I had taken records, yes.

(Dep. at 268:13–18).

\* \* \*

Q. When you met with the government attorneys, with Ms. Potter, that we have talked about before, did any of the government attorneys mention anything about your copying and removing confidential patient records from the clinic?

A. Not that I can recall.

Q. Do you know if they knew about it? Do you have any idea if they knew about it?

A. Yes.

Q. Did they say way to go or that was something you should not have done or you don't remember anything?

A. They did not respond to either way.

Q. Were they—do you recall that the government attorneys were critical in any way for you copying those confidential HIPAA protected patient records and taking them from the practice?

A. No, not that I recall.

(Dep. at 281:9–282:3); *see also* (Dep. at 152:24–153:2) ("Well, did you consider part of her retaliation asking you to return stolen documents to her practice."); (Dep. at 153:19–22) ("So you got your last paycheck even though you did not—even though you refused to return stolen records, is that what you are telling me?"); (Dep. at 228:24–229:3) ("So your lawyer told you not to return documents that you had illegally copied and removed from the office in violation of HIPAA regulations and you took that advice; is that right?"); (Dep. at 240:21–23) ("It's okay for her to steal records and HIPAA, but it's not okay to use a settlement document.").

This case is not about whether Baltazar violated HIPAA or had a legal right to take the patient records; it is about Defendants' alleged violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.,* and the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/15(a), by submitting false claims to Medicare and private insurers. Repeatedly accusing Baltazar of illegally copying patient records was out-of-line and unacceptable. The obvious purpose of Attorney Hannafan's repeated questions was to intimidate and scare Baltazar.

■ The conduct reflected in this record demonstrates good cause to justify the issuance of a protective order under Rules 26(c)(1) and 30(d). When there is a breakdown of decorum at a deposition, a court should use "its authority to maintain standards of civility and professionalism. It is precisely when animosity runs high that playing by the rules is vital. . . . Because depositions take place in law offices rather courtrooms, adherence to professional standards is vital, for the judge has no direct means of control." *Redwood v. Dobson,* 476 F.3d 462, 469 (7th Cir.2007). Accordingly, the Court orders as follows. A different lawyer than Attorney Hannafan must conduct Baltazar's continued deposition. Attorney Hannafan will not attend Baltazar's continued deposition. Baltazar's continued deposition shall take place at the federal courthouse in Chicago. After the discovery stay is lifted, the parties are directed to contact the undersigned's courtroom deputy, Lynette Santiago, at (312) 435–5833, to make arrangements regarding the exact location for the deposition. The continued deposition of Baltazar is limited to new material not covered in the original deposition.

■ As to the time remaining for Baltazar's continued deposition, the Court previously ruled that Defendants were allowed three additional hours to complete the deposition. (Doc. 136). The Court has reconsidered the matter and finds reason to change the ruling. The Federal Rules of Civil Procedure limit depositions to "1 day of 7 hours." Fed. R. Civ. P. 30(d)(1). Baltazar's deposition lasted from 9:39 a.m. to 4:29 p.m., with breaks of 1 hour and 48 minutes. "[O]nly the time taken for the actual deposition, not breaks, counts toward the 7 hours. . . ." *Condit v. Dunne,* 225 F.R.D. 100, 112 (S.D.N.Y.2004). Baltazar's actual deposition lasted 5 hours and 2 minutes. Time wasted on irrelevant questions during the original deposition count against the 7 hours allowed by the Rules. Defendants may therefore continue Baltazar's deposition for another 1 hour and 58 minutes—for a total duration of seven hours as permitted by the Rules. Baltazar's counsel may ask follow-up questions at the conclusion of Defendants' continued examination of Baltazar.

To eliminate any further inappropriate conduct, all remaining depositions shall be conducted pursuant to the following guidelines in addition to the applicable Federal Rules of Civil Procedure:

(1) Examining counsel shall be courteous, respectful, and civil to all other counsel and witnesses;

(2) Examining counsel shall not interrupt the witness. Counsel shall permit the witness to fully answer before propounding subsequent or follow-up questions;

(3) Examining counsel shall not characterize or comment on any answer given by a witness;

(4) Examining counsel shall not engage in any argument with the witness or opposing counsel. Any objection shall be made on the record and appropriate relief may be sought from the Court; and

(5) Examining counsel shall not call a witness a liar. A witness' veracity can be examined without calling the witness a liar.

Baltazar seeks an award of her attorney's fees for filing this motion. Rules 26(c)(3) and 30(d)(3)(C) direct that "Rule 37(a)(5) applies to the award of expenses." Rule 37 states that a "court must . . . require the party or deponent whose conduct necessitated the motion . . . to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A). The rule further states that the "court must not order this payment if (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." *Id.*

Under the circumstances, the Court finds monetary sanctions are appropriate. None of the exceptions apply in this case. Baltazar's counsel satisfied her obligations under Local Rule 37.2. In addition, Attorney Hannafan's position that he did nothing improper in conducting Baltazar's deposition is not substantially justified. Quite the contrary—this Court has found that he engaged in repeated improprieties during Baltazar's de-

position. Finally, there are not any circumstances that would make an award of attorney fees and expenses unjust. Pursuant to Rule 37(a)(5)(A), Attorney Hannafan shall pay the reasonable expenses, including attorney's fees, Baltazar incurred in bringing the instant motion. Within seven (7) days, Baltazar's counsel shall file an affidavit of expenses and fees incurred in bringing the motion. Defendants may respond to the affidavit within seven (7) days thereafter.

Baltazar's request for her attorney's fees and costs incurred in defending her deposition is denied. As Defendants were entitled to depose Baltazar for seven hours in any event, no excess amount of attorneys' fees and costs resulted from Attorney Hannafan's conduct.